May it please the court, my name is Andy Jacob. I represent the employer appellant. In a sense, this case is not about ICE, and it's not about my client. It's about deterring flagrant misconduct by the Maricopa County Sheriff's Office. The degree of that misconduct, the flagrancy of it, affects the notion of whether there was attenuation between what the Sheriff's Office did and the investigation by ICE. The court asked us to address two cases, Johns and Gorman. And both of those cases applied suppression in a context analogous to that here, where tainted information was communicated by one agency to a second one. And the courts said because that transmission of tainted information substantially caused the subsequent investigation by the second agency, even though the second agency itself didn't do anything wrong, merited suppression. In both those cases, they didn't really talk about suppression serving the function to deter the first agency. But we have case law that's very clear about that. And I would call the court's attention to the Davis v. U.S. case from the U.S. Supreme Court from 2011, where they talk about a line of cases where they calibrate the cost-benefit analysis of suppression, factoring in the flagrancy of the misconduct. The misconduct here was not the kind of misconduct that you've heard of today, where an officer is thinking very quickly, forgets to say something, doesn't quite maybe have suspicion to stop someone, all happening in a few seconds' time. The misconduct here, which the government does not contest, was described by the State court as really a conscious disregard for the truth, which is a polite way of saying lying. The misconduct here was in filling out an affidavit for a search warrant, omitting all sorts of information that would speak against there being probable cause, and putting information in that wasn't true to support the probable cause. I think it's pretty obvious how egregious the conduct was in getting that search warrant in the State court proceeding. Help me understand the causal link that led to the second proceeding, the one at issue in front of us. This goes to, of course, what you're talking about in terms of egregiousness under the analysis does inform the attenuation analysis, but I also want to know cause and effect. Sure. The cause and effect, I believe, should be viewed from the viewpoint of the Sheriff's Office, because it's the Sheriff's Office that we're trying to deter. Well, first off, just what happened? What happened was the Sheriff's Office did the raid. They got information. Some of that information they had prior to the raid, but in the raid, they said they obtained evidence that there were currently ten employees who were not properly documented, that there was forgery, without specifying what that was, and that they had evidence that the owner of the business knew this was going on. As soon as they came back to the office, they wrote this up. It happened to have been partly untrue as far as what the owner knew, and they sent an e-mail to three people at ICE, amongst other people, attaching this report. There's no reason that they would have sent this to ICE, except they wanted to cause ICE to begin their own audit of Fremont Management to impose a civil fine. We were not allowed to take the depositions of two of the three people that they sent that e-mail to, but we were allowed to take the deposition of the agent who did the audit, and he was very clear that he had no intention of auditing this business until after he heard about this raid. Now, he denies that he saw that e-mail, which may or may not be true. Ordinarily, you would want to be able to take the deposition of everybody that got the e-mail to sort of find out why was it sent there, so we weren't able to do that. But he does say that he heard news reports that reiterated everything that was in that e-mail, and those news reports were caused by the sheriff's office making press releases and making public statements. They showed intention to let ICE know about this, and ICE learned about it indirectly through this being a news story. And Mr. Miller testified that he only began this audit investigation because he learned about this raid. Now, that makes our case a little different from the two cases that you asked us to look at, where there's no question that there was one brain talking to the other brain. They got them on the phone. They gave them the information. The difference here is that the information went through other people, went through the news people to Mr. Miller. It was made public. Right. It was more than a lead, as in U.S. v. Smith. Right. It was held to be only a lead. All right. It was made public. The question, again, when you suppress in a situation like this, is not Mr. Miller's state of mind other than to establish the but-for causation element. It's was this what the sheriff's office intended to have happen? And arguably, if that e-mail wasn't sent, you'd say, how do we know what the sheriff's office intended? But there's no evident explanation why the sheriff's office sent that e-mail to ICE other than they wanted ICE to do something. And not only did they want that. The whole purpose of this is that the sheriff's office is seeking publicity that they're hard on the immigration issues. And they wanted support. They weren't sure that the county attorney was going to prosecute in this case because they never had before. So if they could get ICE to do something, that could add to the news story, the value of the sheriff coming across as being hard. And that's what we need to deter. We need to prevent the sheriff's office from having this flagrant misconduct achieve what they sought to have it achieve. The other thing I wanted to call the court's attention to is the Adamson case. The two cases that the court asked us to look at were cases where there was a criminal prosecution, and the issue was to suppress evidence in that subsequent criminal prosecution. At Adamson, it was a civil investigation like we have here. And what the court held in that case is that maybe there is a little higher standard to suppress when you take information from one agency to suppress information in a civil investigation. And that's where they basically were talking about the first agency had to act in bad faith. And I think if you just forget that you need a search warrant or you make an error and you think you don't need one, or you pat someone down when maybe you don't have cause for it or you can't articulate it, that's not bad faith. But when you're lying in an affidavit for a search warrant and you have time to edit it and to check it with other people and to talk about the evidence, that's intentional conduct. And it's polite to say it's a disregard for the truth. It's flagrant, and that satisfies Adamson. If the Court doesn't have any questions, I'll reserve the rest of my time. Roberts. Let's hear from the other side. Thank you. May it please the Court. My name is Andrew O'Malley, and I represent the respondents in this case. I'd like to emphasize at the outset here that there's no allegation or evidence that ICE engaged in any wrongdoing. Petitioner tacitly conceded that in his remarks. I'd also like to point out that Petitioner does not challenge the ALJ's finding with respect to liability for his I-9 violations or the amount of the fines set by the ALJ in that regard. So you are not arguing against Trimble's claim that MCSO engaged in egregious Fourth Amendment violations. Are you conceding this point? I think that it would be consistent with this Court's case law to say that that was probably an egregious violation. All right. I think that's well found in this Court's case. Thank you. So the only real issue is attenuation. I think so, Your Honor, yes. And perhaps it's best to start with the two cases that this Court has asked us to address, which are Johns and Gorman. Johns, of course, dealt with a customs officer who asked a sheriff's office to go and conduct a search or surveillance, and they did. And then based on that, that customs office went out and in a single stream of investigation found drugs. And to the extent that it's relevant that there was a separate agency there, the sheriff's office, they were acting at the behest of the customs agents. With respect to Gorman, which I think is a little more instructive, there, of course, one police office specifically requested that another police office down the road conduct a search with a dog to obtain the evidence that that police office was initially seeking. And in rejecting the attenuation argument, Judge Reinhart noted that the searches occurred less than an hour apart. They were closely linked. There was nowhere in the search. Kagan. I apologize. I tend to have those. I lose you. There were no intervening circumstances to purge the taint, and the second search was entirely the product of the request of the first search. They were inextricably linked, and it was deliberate and planned that that search would happen. Now, Judge Reinhart said that the officer's impermissible gamesmanship is precisely what the Constitution prescribes. There's no gamesmanship here. There's no evidence. Well, gamesmanship is sort of a pejorative term. If the question is, rather than gamesmanship, if the question is, did the sheriff's office intend that the information that it unearthed by its illegal search be used to stimulate activity by ICE, the answer is yes. I don't know if that's correct, Your Honor. That last email that went out with the shift summary went to, I think, 26 individuals in the law enforcement community. There were the three individuals from ICE, but this is a sheriff's office that's operating in the same territory with multiple law enforcement agencies. I don't know if it's a reasonable conclusion to say definitely that was meant to induce ICE to go ahead and launch an I-9 investigation. I think it would be an implausible conclusion to conclude otherwise, given what we know about the operation of that sheriff's office. Even if that's the case, even if we assume that the sheriff's office wanted ICE to go out and conduct this investigation, we know from the record that it had no effect on ICE. Well, there are various ways to convey the message. Any trial lawyer knows that publicity is one way to get the message out. So if you can't quite talk to the jury directly, you try to get a lot of stuff in the newspapers and hope they'd ignore the judge's instruction not to read the newspapers. I mean, everybody knows that there are various ways to get the message out. This was belt and suspenders. They sent an email and they issued a press release. I think you'd have to find that the sheriff's office specifically issued a press release to induce the news agencies to publish information to get ICE to go out and conduct a paperwork audit of this employer, and I don't think you can make that logical leap. I mean, they're publicizing their activities. They made significant arrests. They found significant information of identity theft, and they're publicizing that. Of course they would. I think any sheriff's office would. I don't think it's an easy leap to make to say that that was done to induce ICE to go out and do an I-9. Well, if all we had was the press release, I think you might be on pretty good ground. But we have the press release, but we also have email to three ICE employees containing the same information. We do, Your Honor, we do, but I would emphasize that the agency here, the ALJ, made a factual determination based on the auditor's statements, which specifically say, I made the decision to initiate this audit based on my viewing of local news and Internet reports. I then went and I looked at the history for this company and saw that we received a tip in 2012, an anonymous tip. ICE maintains tip lines to receive information about employers in this area. I noticed also that we conducted an audit in 2000, but they didn't have information on the outcome of that audit. And based on that, I went out and I initiated this investigation, not because of the shift summaries. That's a factual determination by the agency that is reviewed for substantial evidence. The fact that there are these shift summaries that the auditor did not use in making the determination to target this employer, that's not compelling evidence that would go against the agency's determination that it was based on those news reports. Well, what? Yes, but could I ask why the ALJ wouldn't allow discovery on the other two emails? You said it's a fact determination and you have emails to three ICE employees. Because the information would be duplicative, Your Honor. The auditor is the one who initiated this investigation. I think his supervisor was on the chain, was a signatory on some of the documents, but he just signed off on this auditor's decision to go out and target this employer after the fact. The decision was made by the auditor. They could add nothing to the decision. You know, that's easy to say, but that's easy to say because there's been no deposition. Yeah. I understand that, Your Honor. But again, the factual determination is there, it's reviewed for substantial evidence, and there's no compelling evidence to conclude to the contrary that the decision was made based on those news articles. I'd like to address Adamson. I'm sorry to interrupt you, but I had a question about the sheriff's office sent shift summaries to ICE right after its raid and right after its arrest of Fribble. Why doesn't it show that the sheriff's office had immigration enforcement as its primary zone of interest? I don't know who the other individuals are on that email. I don't know if they were from other law enforcement agencies. That information is not in the record. I don't think you can just conclude from the fact that they sent shift summaries to other law enforcement agencies that they wanted to somehow induce ICE to go ahead and do this. Again, that's a leap I don't think you're able to make just because these individuals from ICE were included on those emails. Adamson, I'd like to address. Petitioner brought it up as a third case of relevance. In that case, which was a tax assessment, a jeopardy assessment, which was excluded, that evidence that was relied on by the IRS there is the exact evidence that was discovered through the illegal search. That's not the case here. We have an independent agency that issued an independent subpoena based on a news report, conducted its own investigation, collected its own evidence, and assessed a penalty based on that. I'll note just as a background here, because these cases don't come up very often, that ICE doesn't have to have a reason to subpoena these documents from an employer. That's part of the bargain that was created by Congress in 1986 when they passed this law. Sorry, Your Honor. That's part of the scheme that was set up by Congress when they passed this law in 1986, is that the employer would bear the burden of filling out these I-9 paperwork to demonstrate that they check for employment authorization and that ICE would have access to audit those documents when they wanted to. And lest there be any concern that this is some random law that ICE chose to use to go out and get this employer, it's not. Enforcement has ebbed and flowed over the years since 1986, but in 2009, ICE made this a priority, publicly announced it, and we've seen a significant uptick in these types of audits across the country. They trickle up slowly to the circuit courts. We don't see a lot of them here for various reasons, but there has been an increase in this enforcement. It is a priority for ICE. I'd also like to address the fact that there's no deterrent value to excluding this evidence. Well, deterrent value to whom? Deterrent value to people in the position of the sheriff? Their evidence has already been excluded, and their criminal case is already gone. They have no the I-9 audit. The paperwork violation audit is not within their zone of primary interest. Their case is gone and done. Their evidence was suppressed. This is wholly separate. Excluding this evidence would not do anything. I'm not so quick to come to that conclusion, given the operation of this sheriff's office. Well, and also, I understand the concerns with the sheriff's office. But I think as a matter of policy, it's difficult as well. Because if you say that this evidence must be excluded because this employer learned of this, the ICE learned of this employer through this news report, that's always going to be the case. And this employer is going to be excluded or shielded from liability forever. ICE will always have learned of this employer's activities. But they're not asking for a rule that says whenever ICE learns of something from a news report, they can't use it. That's not what they're asking at all. Well, that's essentially what it is. It's this news report. Well, but this is a very special news report coming as a result of outrageous behavior on part of the sheriff's department, when the sheriff's department, in addition to the news report, is presenting precisely this information by e-mail to three employees of the organization. At that time, ICE had no reason to know that this was, that this evidence was going to be, that the subpoena would be, excuse me, that the search would be invalidated. That was in 2015, a full two years after ICE initiated audit, after the shift summaries, and after the news reports. That was well after. This information is on the news. As a matter of policy, you want ICE to go out and investigate. Different employers are going to be concerned about competition. The public is going to say, well, what is ICE going to be doing about this? And, again, the sheriff's office evidence was excluded. None of it is here. Their case fell apart. They've been punished and penalized. This is not in their zone of primary interest. I understand the concerns about the sheriff's office, but penalizing ICE's case and shielding this employer from liability for its paperwork violations, which are a continuing violation for the amount of time that those I-9s must be retained by the employer, so still a violation, there's no deterrent value to that. That's not what the Fourth Amendment is meant to do. If there are no further questions, Your Honor, thank you very much. I appreciate it. Thank you. I think I just need to call the Court's attention to where the record answers some of the questions that you asked. In the appendix that we gave the Court on pages 112 to 113 is the order by the ALJ denying our request to take the depositions of the two other people from ICE. The reasoning that the ALJ gave was that this evidence is not suppressible because it's identity evidence. And I think the ALJ just didn't understand the basis for the cases that they're used to seeing where someone wants to suppress their identity as someone in the country without authorization. That's not our situation here. And I also want to call the Court's attention to our reply brief on page 1. And at the bottom of page 1 is language from the affidavit that Mr. Miller gave. And he says the worksite case was initiated based on information generated from the local television. So even though they looked in, their records got a little more support maybe from what they had, he's very clear this investigation occurred because of what he heard coming out of the raid. The two cases that the Court asked us to look at, Johns and Gorman, both had language showing that the tainted information didn't have to be the only cause of the second investigation. Johns uses the phrase significantly directed, and Gorman uses the phrase part of the impetus. And I think we can surely say that the information that ICE learned about the sheriff's office raid at least partially directed or was significant impetus for what they subsequently did. Thank you. Thank you. Thank both sides for your helpful arguments. Criminal Management v. United States now submitted for decision.
judges: D.W. Nelson, W. Fletcher, Fisher